Filed 4/16/21  P. v. Scrivens CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>FABIAN ANTWAINE SCRIVENS,<br><br>      Defendant and Appellant. | C081371<br><br>(Super. Ct. Nos. CR20129048,<br>SF121455A) |

Defendant Fabian Antwaine Scrivens committed various violent sex offenses and criminal threats against the mother of his children in August 2012.  During trial prior uncharged acts against the victim and two others were admitted into evidence.  A jury found defendant guilty of infliction of corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)),[1] sexual penetration with a foreign object (§ 289, subd. (a)(1)), attempted

---

[1]  Undesignated statutory references are to the Penal Code.

1

forcible penetration with a foreign object (§§664/289, subd. (a)), forcible rape (§ 261, subd. (a)(2)), attempted sodomy by force (§§ 664/286, subd. (c)), and making criminal threats (§ 422), but not guilty of failure of a sexual offender to file a change of address (§ 290.013, subd. (a)). The court sentenced defendant to an aggregate term of 275 years to life plus 66 years. Defendant appeals, arguing: (1) insufficient evidence supports the attempted forcible penetration conviction; (2) battery is a lesser included offense of attempted forcible penetration; (3) numerous instructional errors; (4) the court erred in admitting evidence of uncharged acts; (5) cumulative error; and (6) sentencing error.

The parties agree the court erred in the imposition of four prior serious felony enhancements. In supplemental briefing, defendant also argues the matter should be remanded to permit the trial court to exercise discretion under Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill 1393) to strike nine other prior serious felony conviction enhancements. The People agree.

## FACTUAL AND PROCEDURAL BACKGROUND

During an attack on the victim in August 2012, defendant committed violent sexual offenses, domestic violence, and criminal threats.

An amended information charged defendant with infliction of corporal injury to a spouse (count 1); sexual penetration with a foreign object (count 2); attempted forcible penetration by a foreign object, a water bottle (count 3); forcible rape (count 4); attempted sodomy by force (count 5); making criminal threats (counts 7 & 9); and failure of a sexual offender to file a change of address (count 8).[2]

The amended information also alleged as to count 1, defendant used a weapon, a belt (§ 12022, subd. (b)(1)); as to counts 2 and 4, that defendant used a deadly or dangerous weapon, a belt (§ 667.61, subd. (e)(3)) and that defendant had two prior

---

[2] The court granted the prosecution's motion to withdraw count 6, forcible rape. (§ 261, subd. (a)(2).)

2

convictions for forcible sex crimes (§ 667.61, subd. (d)(1)); as to counts 1 through 9 that defendant suffered two prior strike convictions for rape (§§ 667, subd. (d), 1170.12, subd. (b)) and served a prior prison term for rape (§ 667.5, subd. (b)); as to counts 1 through 7, that defendant had two prior felony convictions; and as to count 9, that defendant had one prior felony conviction (§ 667, subd. (a)).

A jury trial followed. During trial prior uncharged acts against Leanna and Michelle were admitted into evidence, as well as prior uncharged acts involving the victim. The following additional evidence was also introduced:

**The Victim and Defendant's Relationship**

Defendant moved to the victim's neighborhood in the 1990s. The victim testified that she and defendant, who is five years older, became involved in 2011. When she became pregnant their relationship ended. Their twins were born in 2012. Defendant accused her of cheating on him and began making threats against her family. Although she ended the relationship, she tried to keep the relationship civil because she wanted defendant in her children's lives.

After the birth of the twins, she suffered heart failure and was readmitted to the hospital. While she was in the hospital, defendant accused her of cheating on him and threatened to leave the twins, who were only a few days old, home alone. He told her he could no longer protect her. Defendant had been in a gang as a teenager, and she interpreted his threat to mean he could not protect her from the gang.

**July 26, 2012 Incident**

In July 2012 defendant visited the twins daily. On July 26, 2012, the victim took the twins to defendant's house to spend the night. Since she was not afraid of defendant at that time, she also spent the night. However, she did not want to sleep in the same bed with defendant, because she did not want him to get the wrong idea.

3

The victim and defendant began arguing as they tried to get the twins to sleep. Defendant told her that, after the twins went to sleep, he would beat her up. She was afraid, but lay down on the bed after the twins fell asleep.

Defendant got on top of her, pinned her to the bed, and threatened to have sex with her. She told him repeatedly to get off and he eventually did. Defendant got on top of her again and said he wanted to have sex; she again told him to get off. Defendant eventually complied.

In the morning, she took the twins and went home. Defendant later texted her something like "green light go," which he said he had not meant to send to her. She understood the phrase as a green light for a gang member to kill someone, and assumed it was a threat against her or her family. Although she told her mother what had happened, she did not call the police out of fear of gang retaliation. The victim and her family later received strange texts about gang members coming after them.

The victim's mother testified her daughter was shaking and upset the following morning. The victim's mother spoke with defendant's mother after the incident. Subsequently, defendant told her not to speak to his mother and said he was going to take care of her himself. The victim's mother believed defendant intended to hurt or kill her.

The victim's father called the police that morning. The victim spoke with the officers who arrested defendant. She obtained a restraining order against defendant. Defendant became upset about the restraining order and her filing for custody of the twins.

**August 26, 2012 Incident**

In August 2012 defendant's threats against the victim increased. Defendant told her not to go to court or something would happen to her and her family. Despite the threats, she continued to allow defendant to see the twins in a manner that avoided violation of the restraining order.

4

On the afternoon of August 26, 2012, defendant told the victim he had something for her to read. He handed her a note she later called the "death note," telling her she had a choice between life and death. If she chose life, defendant would tell her what to do and when to do it. He would decide what would happen to the twins. If she chose death, three of her friends or family members would be killed. Because of his gang connections, she believed defendant. He also told her if gang members went to a house, everyone inside would be killed. She chose life and defendant took back the note. He told her he was going to beat her up.

Nervous and scared, she waited until her parents left so they would not know about the beating. After they left, defendant came to the house with a stool and a belt. Defendant put staples into the belt, telling her they would cause more damage. When she realized he was going to hit her with the belt, she said she wanted to choose death.

Defendant struck her with the belt while she sat on the living room couch. As the belt struck her thighs she cried out. Defendant forced her to remove her pajama bottoms and underwear. He told her to put her knees on the stool and her hands on the floor, elevating her buttocks. Defendant told her not to move and hit her across the buttocks several times with the belt. She begged him to stop and tried to distract him to no avail. He continued hitting her despite her cries.

Defendant stuck his finger into the victim's anus. She screamed. He threatened to stick a baby bottle in her anus; one was sitting on the piano. She begged him not to. Defendant threatened to stick a water bottle in her anus and picked up a water bottle and touched her buttocks with it. He told her what he wanted to do with it; she asked him not to do it.

Defendant then forced his penis into her vagina. She remained in the same position on the stool. She did not fight back out of fear and because her children were in the next room. He tried unsuccessfully to penetrate her anus with his penis. She bled the

5

entire time and repeatedly asked him to stop. Defendant took her cell phone and took pictures of her. He took a towel from the kitchen and put it over her buttocks.

Defendant allowed her to get up and get dressed. She cooperated with defendant because she was worried for her safety and the safety of her twins. She also was worried about her parents; defendant said they would be hurt if he went to jail. Frightened, she told him they would be home soon so that he would leave. Defendant left, taking the belt and the stool.

When her parents returned, she told them what happened. She was crying and told her parents defendant was going to kill them. Her father called 911.

Sean Ross, a police officer, accompanied the victim to the hospital. She had a laceration on her thigh and bruises on her arm, thighs, and buttocks. The laceration appeared to be bleeding. As he spoke with her, she was upset and crying. She told Officer Ross that she had been assaulted and raped by her "ex," the defendant. Defendant assaulted her with a belt with staples and a bottle. It happened in the afternoon in the living room of her parents' house. She did not appear to be under the influence of alcohol or drugs.[3] Officer Ross took the victim's clothing into evidence as well as a small towel and her cell phone.

A hospital examination revealed the victim had a contusion on her hip and gluteal region which was black, blue, and red. She had abrasions beneath both buttocks, which were bleeding. There were no scabs, indicating they were fresh. The bruises appeared new, as if they had happened the same day. Her blood tested positive for hydrocodone. A nurse found the examination results consistent with the victim's version of events. The victim reported pain in her buttocks and left thigh and bleeding in her vagina. She stated she had been assaulted by defendant that afternoon in her parents' home.

---

[3] The victim had a history of cutting herself with box cutters, but not to the degree of her injuries from defendant's beating.

**Pretext Text Messages**

Detective Clarence Yates used the victim's cell phone and texted defendant under pretext in an attempt to confirm her allegations.

On August 28, 2012, Yates texted: "That was messed what you did and got no choice but to help police for the [kids'] sake." Defendant responded: "Out front, I'm assuming is you out front. You sending me away forever."

The next morning, Yates texted defendant: "You the one who raped me and tried to shove a water bottle up my ass and threatened to kill my friends. Don't put this on me." Defendant responded: "I never wanted this." After talking to the victim's mother, Yates texted: "Please stop calling my mother, she's already scared enough." Defendant texted: "You are done and free."

Later that day, defendant sent the victim a text: "Help me help you." Yates texted: "How? By raping me again?" Defendant texted: "green." Yates texted: "?" Defendant texted: "Deal went bad. All on sight. Turning myself in." Yates texted: "All I want is an apology for what you did." Defendant texted a message with no characters in the text followed by the words "how" and "frozen." Yates then texted: "Let me know that you're sorry for what you did and help me understand why." Defendant texted: "You told them I raped you, beat you."

Defendant then texted: "If it's you, what do I call Sierra. You not [victim's name]." Yates called the victim and asked what Sierra's nickname was. Yates then texted defendant: "You call her fatty and I hate it. And you know what you did." Defendant responded: "I hate what happened. It was a task recorded and done." According to the victim, this referred to defendant recording his assault on her. Defendant texted: "green." Yates texted: "What are you talking about? Do you even care about the girls?"

Defendant later texted: "You test was not to tell . . . my love." Yates texted: "How was not going to tell? I was bleeding and mom saw." Defendant responded: "I'm

7

truly sorry. It is all part of the deal." The victim interpreted defendant's text to mean, it was part of the "death deal" or the "death note." Defendant texted: "I know I heard you argue with them, that's why I still say your deal is good." Yates took this to refer to the deal in the "death note" and that defendant was confirming the victim was okay because she was arguing with her parents. Yates texted: "Are you ever going to say sorry? I didn't deserve what you did." Defendant texted: "I'll go to prison forever. Will you fix this?" Yates texted: "How?" Defendant texted: "You know I did not want to do that. You knew I was sorry. I told you that when I gave you the cold wet towel." Defendant then texted: "How? What?" Yates texted: "How about trying to shove a bottle up my ass. I don't know who you are anymore."

Defendant then texted: "Call me . . . what do you want to do," followed by "I did not do it. I had to make it sound good. I wanted to cry. I would never do that on my own." Yates texted: "Got to wait for my mom to leave in a couple." Defendant texted: "They say you outside." Defendant then texted: "Go inside." Yates responded: "Who the fuck is watching me?"

Yates then initiated a pretext phone call in an effort to confirm the text messages and that defendant was sending the messages.

On August 30, 2012, Yates texted defendant, "I need to call DT Yates. He's a good cop. He will help." Defendant continued texting the victim until his arrest. Subsequently defendant texted: "[Y]ou M down two hours. You are my one and only love. I'm sorry for everything. This my choice. All my fault. I have no regrets. Your family my kids are safe."

**Subsequent Events**

The victim gave officers the stapler used by defendant and her cell phone. She obtained a restraining order against defendant on August 29, 2012.

Defendant was taken into custody on August 31, 2012. After receiving no response when they arrived at defendant's home, officers forced their way in and took

defendant into custody. Defendant asked for his shoes, which officers brought. He then asked for his belt. He asked an officer if they were investigating his belt. Defendant laughed and said, "The belt you are going to want to investigate has staples in it."

Officers seized two black stools, one of which the victim identified as the stool defendant used in the assault. In addition, officers seized from defendant's bedroom a belt, computers, a hard drive, video cameras, driver's licenses, and cell phones.

**Expert Testimony**

Dr. Bennet Omalu, a forensic pathologist, testified as an expert in trauma pattern analysis. After examining defendant's belt, Dr. Omalu determined the belt had been "weaponize[d]," with eight metal staples affixed to the belt with the pointed tips protruding. The belt's configuration was consistent with the weapon used to inflict the victim's injuries. Based on the staples and the injuries, Dr. Omalu testified: "There is almost no other belt on the face of the earth that has this distinctive characteristics [*sic*]." He believed defendant's belt inflicted the injuries. The injuries were not self-inflicted. Dr. Omalu went into great detail as to how the belt caused multiple, severe injuries.

**DNA Evidence**

DNA extracted from vaginal and anal swabs taken during the victim's examination was analyzed. The male DNA profile from the anal swab was consistent with defendant's profile. He could not be eliminated as the contributor. The male DNA from the vaginal swab could not be interpreted because it showed only a partial profile.

**Testimony Regarding Michelle**

Michelle was an adult at the time of the trial. Her mother testified that, when Michelle was 17 years old, Michelle and her two brothers lived with her parents in Stockton.

One morning in May 2002, Michelle called her mother. Her mother did not know Michelle had left the house. Michelle asked her mother to pick her up, but Michelle did not know where she was. Michelle's parents picked her up at the house of the woman

9

who had let Michelle use her phone. When they arrived, Michelle was cowering and clutching her clothes in fright. Michelle told her mother she had been sexually abused and needed to see a doctor. Michelle could not get away until her abuser fell asleep. Michelle's mother took her to the hospital.

Michelle testified she met defendant when she was 16 or 17 and had seen him four or five times. In May 2002 Michelle, while walking in the neighborhood, saw defendant driving. She got in his car, believing he would give her a ride home. The day before, Michelle and some friends had gone to defendant's house. Some of them may have smoked marijuana. However, instead of taking her home, defendant took Michelle back to his house. Michelle went into defendant's bedroom where he told her to take off her clothes. After Michelle told defendant "no," he took her into the bathroom and turned on the shower. Defendant said if Michelle refused to cooperate he would turn on the hot water and put her in the shower. Defendant had adjusted the pipes so that the water stayed hotter longer. Michelle was afraid of defendant because he was much bigger.

They went back into the bedroom and Michelle undressed. Defendant said no one knew where she was, so he could bury her in his backyard and no one would find her. He said he had friends who were gang members and he would invite them over if she did not cooperate with him. Defendant told her to drink some alcohol to calm down; Michelle pretended to drink it.

Defendant told her he would take her home after they were done, but Michelle did not believe him. He forced her to have intercourse. He penetrated her vagina repeatedly throughout the night. Defendant tried to put his penis in her anus but was unable to. As dawn broke, defendant fell asleep. Michelle got up, dressed, and as she left the house an alarm went off. She saw defendant's uncle who told her she could leave. After no one answered the door at the nearest house, Michelle finally found a woman who answered the door. She called her mother, but she did not know where she was.

10

When her mother picked her up, she asked Michelle if she had been raped. When Michelle said yes, her mother took her to the hospital where she was examined.

Michelle does not know the victim. She has a friend named Leanna.

**Testimony Regarding Leanna**

In 2001, when Leanna was 14, she lived with her father, stepmother, and siblings. Leanna and her sister were friends with Michelle. Defendant was a neighbor who came over to visit one of Leanna's brothers.

In September 2001 Leanna's stepmother called defendant's mother to discuss defendant's behavior. Defendant and his mother came over. Defendant had been touching Leanna inappropriately, grabbing and groping her. He did not deny the accusations. Leanna's stepmother told defendant he could not come to the house when she was not there.

The following month, Leanna gave her stepmother a note saying defendant repeatedly raped her. Leanna was crying and upset. Her stepmother asked Leanna why she had not told her sooner, and Leanna said defendant threatened to kill Leanna and her family.

Leanna testified she met defendant when she was 12 or 13 years old. One day she needed help with her homework and defendant was the only one in the house. She was afraid of him because he was much bigger. After he helped with her homework, defendant followed Leanna into her bedroom. Defendant asked her to take off her clothes and Leanna refused. He asked her how old she was. When she told him, defendant said "never mind" and left the house. Defendant later told her he would come back when she was older. Leanna told her stepmother what happened and her stepmother talked to defendant and his mother.

Several years later, while taking a shower, Leanna heard the door open. Defendant told her to get out of the shower. Leanna got out, intimidated by defendant. Defendant told her to take off her towel, but Leanna refused. In an aggressive tone,

11

defendant told her if she did not take off the towel he would kill her family. Defendant touched her buttocks and thighs and had sexual intercourse with her.

Leanna did not scream because she was frightened. Defendant told her not to scream or he would kill her little brother, the only person home at the time. After he was finished, defendant told Leanna that if she told anyone he would throw her into a ditch and no one would find her. Leanna was terrified. Leanna told her little brother what happened, but he did not believe her. Later she told her sister, who also did not believe her.

Defendant returned a few days later, forced Leanna to remove her clothes and raped her in her bedroom. He attempted to penetrate her anally, but she moved and he only penetrated her vagina. Defendant said if she told anyone he would kill her family and friends.

On another occasion, defendant asked her to take off her clothes, but Leanna refused. Defendant took off her clothes and put his fingers in her vagina. On another occasion, defendant made Leanna put her lips around his penis. Defendant told Leanna if she told anyone he would come after her after he got out of jail. Leanna was afraid and believed defendant's threats.

Defendant continued to rape Leanna during the summer of 2001. The rapes occurred when Leanna was in eighth grade and continued into her freshman year. Defendant came over on weekdays when Leanna's parents were not home. He raped her each of those days. Leanna told officers about the assaults after she told her mother about the rapes in October.

**Defense Case**

Defendant testified in his own defense.

*Leanna*

He denied ever having sex with Leanna. One day, when defendant was at Leanna's house hanging out with her siblings, Leanna called him into her bedroom. She

12

only had a towel on, which she dropped, and said "chink chink" or "boom boom." Leanna put the towel back on and followed defendant into the living room. He told Leanna he would talk to her but that she should "just do something with herself." That night Leanna's mother came to defendant's house, but she never warned him to stay away. He stayed away from Leanna's house because his mother "flipped out."

### Michelle

He and Michelle had consensual sex for over a year. In May 2012 defendant, Michelle, and two other people went to defendant's house. They all smoked methamphetamine, except one of the other boys who smoked marijuana. Michelle asked defendant for many things, but he gave her only marijuana. He gave her a bag worth $40 and she signed a note saying she would pay him back in seven days.

The next day, he picked Michelle up and they went to his house. In his bedroom, Michelle began smoking "dope." She asked him to go into the bathroom with her and turned on the shower. Then they had consensual sex in his bedroom. He agreed to give her a ride in the morning, but the next time he saw her was in court.

Sex with Michelle was always consensual. He pleaded guilty to two counts of forcible rape of Michelle. He pleaded guilty so that the other charges against him involving Leanna would be dropped.

### The Victim

He and the victim began dating in 2011. They broke up in July 2012. She lied about everything and she received calls and messages from other men. She cut herself during and before their relationship.

In July 2012, a few days after their breakup, she forced her way into his house. She went crazy, threw the phone at him, and refused to leave. He threw her out in the morning and was later arrested.

He did not have sex with her on August 26, 2012. They did have consensual sex a day or two before in his mother's garage. They used a black stool and started having anal

13

sex, but she "stinked." She was still bleeding from her pregnancy. She agreed he could beat her so they would be even.

On August 26, 2012, he went to the victim's house so they could finish having sex. She asked him to bring the stool. He hit her four times with a belt. She hit herself across the thigh. Afterwards, she asked to have sex, but he refused after she cut herself. He did not have sex with her that day.

While at her house, he put two staples in his belt but he did not hit her with it. He hit her with her belt. After he hit her a second time, the buckle of her belt flew off and she got mad because "it didn't hurt or something."

**Arrest**

On August 31, 2012, defendant was awakened by officers. As he sat handcuffed, he did not tell the officer that the belt they were looking for was there because "that would be stupid." Defendant suspected that the victim was not sending him the text messages prior to his arrest. He suspected it was someone else when the person texted "You tried to stick a water bottle up my ass." Defendant stated "I mean if she gets drunk enough, she sticks a water bottle up her own ass."

**Verdict and Sentencing**

The jury found defendant guilty on all counts except for count 8, on which the jury found defendant not guilty. The jury found the special circumstances and prior allegations alleged in the amended information to be true.

The court sentenced defendant as follows: count 2, an indeterminate term of 75 years to life, plus two consecutive five-year terms for the two prior serious felony allegations; on count 1, a consecutive indeterminate term of 25 years to life, plus two consecutive five-year terms for the two prior serious felony allegations; on count 3, a consecutive indeterminate term of 25 years to life, plus two consecutive five-year terms for the two prior serious felony allegations; on count 4, a consecutive indeterminate term of 75 years to life, plus two consecutive five-year terms for the two prior serious felony

14

allegations; on count 5, a consecutive indeterminate term of 25 years to life, plus two consecutive five-year terms for the two prior serious felony allegations; on count 7, a consecutive indeterminate term of 25 years to life, plus two consecutive five-year terms for the two prior felony allegations; on count 9, to a consecutive indeterminate term of 25 years to life, plus a consecutive five-year term for the prior serious felony allegation; and as related to counts 1, 2, and 4, a one-year consecutive term for the weapon enhancement.

In total, the court sentenced defendant to an aggregate term of 275 years to life plus 66 years. Defendant filed a timely notice of appeal.

## DISCUSSION

## I

## Sufficiency of the Evidence for Attempted Forcible Penetration

Defendant argues insufficient evidence supports his conviction for attempted forcible penetration in count 3. According to defendant, his actions in placing the water bottle against the victim's buttocks were merely preparation and lacked any " 'appreciable fragment of the offense.' "

Section 289, subdivision (a)(1) defines forcible sexual penetration as "an act of sexual penetration . . . accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." An attempt to commit a crime consists of a specific intent to commit the crime coupled with a direct but ineffective act done towards its commission. (*People v. Lee* (2011) 51 Cal.4th 620, 623.) Commission of an element of the underlying crime other than formation of intent to do it is not necessary. (*People v. Dillon* (1983) 34 Cal.3d 441, 453 (plur. opn. of Mosk, J.).)

The defendant's specific intent to commit a crime may be inferred from all the facts and circumstances disclosed by the evidence. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1130, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "Although mere preparation such as planning or mere intention to commit a crime

15

is insufficient to constitute an attempt, acts which indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design will be sufficient." (*People v. Ross* (1988) 205 Cal.App.3d 1548, 1554.) The test for an overt act is satisfied when it appears, through the defendant's conduct, that the act will be carried out if not interrupted. (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 13-14.)

In reviewing a challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We do not reassess the credibility of witnesses, and we draw all reasonable inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.)

Defendant contends that his holding the bottle next to the victim's anus was insufficient evidence of an attempt since he never attempted to penetrate her anus with the bottle. As defendant summarizes the evidence, the victim testified he stuck his finger in her anus and threatened to stick a water bottle and a baby bottle in her anus. She asked him not to do that. Defendant picked up the water bottle and "did have it up against my butt, but he never did stick it in." According to defendant, "[w]hile it touched her buttock, he did not stick it in her anus and she did not believe it went between the cheeks. . . . [¶] This evidence showed an act of preparation. However, it failed to show a direct step to commission of the crime."

Defendant fails to present a complete description of the facts surrounding his threat to assault the victim with a water bottle. Defendant began by sending her a "death note," coming to her house while her parents were gone, and carrying the implements he would use in the attack. He forced her to strip and place her knees on the stool and her hands on the floor in preparation for his assault. Defendant beat her with the staple

16

embedded belt, stuck his finger in her anus, and threatened to stick a baby bottle in her anus. She begged him not to. He then threatened to stick the water bottle in her anus. Defendant held the water bottle against her buttocks and told her what he wanted to do with it. She remained positioned on the stool and defendant forced his penis into her vagina. He then tried unsuccessfully to penetrate her anus with his penis.[4]

All of these facts support the jury's finding that defendant attempted to penetrate her with the water bottle. Defendant told the victim what he intended to do with the water bottle, went and got the water bottle, and then held it against her buttocks. These acts took place while she remained vulnerable and subject to numerous sexual assaults. The People did not have to establish that defendant actually penetrated the victim with the bottle in order to find him guilty of forcible penetration. We find sufficient evidence supports the jury's finding.

## II

### Failure to Instruct on Simple Battery

According to defendant, the trial court erred by failing to instruct sua sponte on battery as a lesser included offense of attempted sexual penetration. Defendant asserts that had the jury been so instructed "it would have focused the jurors' attention on the difference between simple battery and attempted sexual penetration" and they "would have searched for evidence of an intent to penetrate and found only equivocal evidence suggestive of [defendant] having made a hollow threat." Therefore, reversal is required on count 3, attempted sexual penetration.

---

[4] During closing argument, the prosecution posited a reason for the uncompleted act: "It is not surprising that [defendant] abandoned the attempt of the water bottle because [the victim] described it as one of the standard water bottles we can get at Costco, whatnot. There was no way that he was going to be able to achieve the ultimate gratification with that. It was too big, so he moved on."

Defense counsel did not request that the court instruct the jury with simple battery as a lesser included offense of forcible penetration. The trial court found no substantial evidence supporting a lesser included offense and noted defense counsel indicated any such instruction might contradict the defense theory of the case.

A trial court must instruct sua sponte on any lesser included offense substantially supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) In determining whether an offense is a lesser included offense we apply a de novo standard of review. (*People v. Ortega* (2015) 240 Cal.App.4th 956, 965 (*Orgtega*).)

Forcible sexual penetration is committed "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim . . . ." (§ 289, subd. (a).) Section 664 punishes a person who attempts to commit a crime, but fails or is prevented or intercepted in the attempt.

Battery is any willful and unlawful use of force upon the person of another. Battery consists of two elements: a use of force that is willful and unlawful. Use of force is satisfied by any touching; willfulness and unlawfulness are satisfied by touching that is harmful or offensive. (§ 242; *People v. Rocha* (1971) 3 Cal.3d 893, 899; *People v. Pinholster* (1992) 1 Cal.4th 865, 961, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Section 1159 provides that a defendant may be found guilty of any offense, the commission of which is necessarily included in the charged offense or of an attempt to commit the offense. A lesser offense is necessarily included within the charged offense "if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements the lesser offense, such that the greater cannot be committed without also committing of the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) Defendant concedes the statutory elements test cannot be met in the present case.

However, defendant argues under *Ortega*, the facts meet the accusatory pleading test. In *Ortega*, the court considered prior case law which established an accusatory pleading test based on specific allegations in the accusatory pleading sufficient to put defendant on notice of what he or she was required to defend against, and based on those allegations upheld the conviction of the lesser included offense. (*Ortega, supra*, 240 Cal.App.4th at pp. 967-968.)

The *Ortega* court considered whether sexual battery is a lesser included offense of forcible sexual penetration. The court concluded the statutory elements test was not satisfied because sexual battery required the unique element of touching by the offender's body whereas forcible sexual penetration could be accomplished by a foreign object. (*Ortega, supra*, 240 Cal.App.4th at pp. 966-967.)

Under the accusatory pleading test, the court considered testimony at the preliminary hearing. The preliminary hearing disclosed that the defendant had touched the victim with his finger. (*Ortega, supra*, 240 Cal.App.4th at pp. 968-969.) According to *Ortega*, "determining whether sexual battery is a lesser included offense of forcible sexual penetration in a case involving digital penetration should not hinge on whether the prosecutor chooses to mention fingers in the charging document . . . it would be unjust to allow the prosecutor, by controlling the language in the charging document, to also control whether the jury considers the lesser offense." (*Id.* at p. 970.)

Defendant points out the amended information charged attempted sexual penetration utilizing the general language of section 289, subdivision (a)(1)(A) with no mention of touching. At the preliminary hearing the victim testified: "And then he did threaten to stick one of the baby bottles in my butt, and he went looking for it and I asked him 'No.' He did pick up a water bottle and he did put that next to my butthole . . . threatened to put it in but did not put it in." She stated the water bottle went between her cheeks. At trial, she testified defendant picked up the water bottle and held it against her buttocks, but did not stick it between her cheeks.

19

However, even assuming the victim's equivocal and contradictory testimony at the preliminary hearing and trial, met the accusatory pleading test for a lesser included offense, we find no error. We reverse for failure to instruct on a lesser included offense only if the error is prejudicial. " 'This test is not met unless it appears "reasonably probable" the defendant would have achieved a more favorable result had the error not occurred.' " (*Ortega, supra*, 240 Cal.App.4th at p. 971.) "[N]o fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely." (*People v. Holloway* (2004) 33 Cal.4th 96, 141.)

Here, the jury faced two divergent glosses on the evidence. Defendant at trial argued he never touched or forced the victim to engage in sexual intercourse on August 26, 2012. She called twice and asked him to bring over the stool so they could have sex. She hit her thigh herself and afterwards asked defendant to have sex, but he declined. Defense counsel argued defendant engaged in no sexual conduct on August 26, 2012.

The victim testified that on August 26, 2012, defendant came to her house armed with a belt with staples. He forced her to remove her pants and underwear and kneel over the stool. Defendant whipped her with the belt, stuck his finger in her anus, and threatened her with the water bottle. He then forced his penis in her vagina.

The issue before the jury was whether defendant's assaults on the victim were against her will by use of force, fear, or threat of retaliation, or whether defendant did not engage in any sexual conduct with her at all. In light of the overwhelming evidence, including the evidence of defendant's other sexual offenses on August 26, 2012, it is not reasonably probable the jury would have found defendant had no intent to penetrate when he touched the water bottle to the victim's anus, resulting in a finding of battery. There is no reasonable probability defendant would have obtained a more favorable outcome had

20

the jury been instructed on battery as a lesser included offense of attempted forcible penetration in count 3.

**III**

**Rape Instructions**

According to defendant, the trial court erred in instructing the jury that defendant could be found guilty of rape where the act is accomplished by threat of retaliation, including a threat to kidnap, if there is a reasonable possibility defendant will execute the threat. Defendant argues this ground was not charged in the pleadings and violated his due process rights to proper notice of the nature and cause of accusations against him.

**A. Background**

The amended information alleged rape under section 261, subdivision (a)(2). Section 261 defines rape in pertinent part: "(a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: [¶] . . . [¶] (2) Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another."

At the preliminary hearing, the victim testified about defendant's assault on August 26, 2012. Prior to the assault, defendant sent her a "death note" in which he gave her the option between life and death. Defendant told her that gang members would come to her house and murder her family. She believed defendant would carry out his threat; she did not want to cause the deaths of her family and friends. She chose life. Sometime after she received the note, defendant came to her house with the stool and the staple embedded belt. Defendant proceeded to beat, sodomize, and rape her.

The issue of defendant's threats and the possibility of him carrying them out arose during in the motions in limine discussions. The trial court also referred to CALCRIM No. 1000, the instruction defining the elements of rape.

21

During the jury instruction conference, the trial court again addressed CALCRIM No. 1000. The court stated that, as the prosecution requested, the jury instruction would present two theories of guilt in count 4: one, sexual intercourse accomplished by force, violence, duress, menace, or fear of immediate and unlawful bodily injury; and two, sexual intercourse was accomplished by threatening to retaliate in the future against the victim or others and there was a reasonable possibility defendant would carry out the threat. The court noted the prosecution requested the modification and that the evidence supported it. Defense counsel offered no objection.

On count 4 the court instructed the jury with CALCRIM No. 1000, in part: "To prove that the defendant is guilty of this crime, the People must prove that the defendant had sexual intercourse with a woman; he and the woman were not married to each other at the time of the intercourse; the woman did not consent to the intercourse; the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate bodily injury to the woman or someone else; or threatening to retaliate in the future against the woman or someone else when there was a reasonable possibility that the defendant would carry out the threat. A threat to retaliate is a threat to kidnap, falsely imprison, or inflict extreme pain, serious bodily injury, or death."

During closing argument the prosecution asserted the rape alleged in count 4 was based on force, fear, and threat of retaliation. The prosecution described common features between the various sex crimes: "The sex crimes we were talking about we discussed before. So here are the commonalities: Penetration, ejaculation, obviously no consent, and then force, fear, violence, desire, duress, menace, retaliation." Retaliation applied to the rape charge: "Finally, retaliation, the part that really shook [the victim] to her core. The part where the defendant had threatened to retaliate against family and friends, described the car her brother was driving, specified that it wouldn't just be your friends, it would be the whole family."

22

The prosecution outlined the evidence surrounding count 4: "The defendant threatened [the victim] with a deal. The deal that we are going to hear about again, and the text messages, and the pretext phone call and the deal was life or death.

"If [the victim] chose life, she said that he would be able to tell me what to do and when to do it. He would control everything that [she] did and he would decide what would happen with their newborns. And then he offered death and it terrified [her]. She said if I chose death, three of my friends and family would be killed. He basically explained what would happen and made sure to tell me if they went to a house, it wouldn't be just their friend, it would be their whole family that would be killed. I told him I was going to choose life because I wasn't going to risk the life of my friend and my family. And it was at that moment that each one of those sex crimes began, the fear, the duress, the menace, and the threat of retaliation began. They continued through the use of the belt and ended at the penetration.

"The defendant's goal in life was to have ultimate power and control over [the victim], and that is exactly what he took advantage of. He threatened her. He beat her and he did the most despicable acts of all, he repeatedly raped her. [She] wanted her friends and family to live. . . ."

## B. Discussion

A defendant cannot be convicted of an offense which is neither specifically charged in the accusatory pleading nor necessarily included within the charged offense unless the defendant consents to the substituted charge. (*People v. Lohbauer* (1981) 29 Cal.3d 364, 367.) Due process under both the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them. (*People v. Seaton* (2001) 26 Cal.4th 598, 640.)

Here, defendant contends the trial court improperly instructed with the elements of section 261, subdivision (a)(6), a definition of rape not listed in the information. Subdivision (a)(6) states: "Where the act is accomplished against the victim's will by

23

threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat. As used in this paragraph, 'threatening to retaliate' means a threat to kidnap or falsely imprison, or to inflict extreme pain, serious bodily injury, or death."

According to defendant: "The court's instruction created an alternative route to a guilty verdict on the rape charge using the theory that rape was accomplished against [the victim's] will by appellant threatening to kidnap the children. Evidence was adduced pertinent to using that route." Defendant concludes: "Given that ambiguity and the difficulty of sorting through those facts, a juror could have chosen to find appellant guilty of rape based on what appeared to be a threat to kidnap the children. Accordingly, the (a)(6) circumstance would have provided the basis for the guilty verdict on the Count 4 rape charge." Defendant "never had notice that he was being charged under section 261(a)(6) and neither consented nor objected to the instruction's unauthorized expansion of the charges, which occurred after the evidence was closed."

We disagree. Whether a defendant received constitutionally adequate notice that the prosecution was relying on a particular theory of guilt entails resolution of a mixed question of law and fact. (*People v. Cole* (2004) 33 Cal.4th 1158, 1205.)[5]

In the present case defendant received adequate notice of the basis for the modified instruction on count 4. The preliminary hearing testimony established that the rape charge was based on the victim's fear of defendant's carrying out the threats contained in the death note. The theory underlying the addition of retaliation was not kidnapping, as defendant asserts, but the victim's fear of defendant harming her, her family, and friends if she did not comply with the death note. The prosecution reiterated

---

[5] The People argue defendant has forfeited the issue by failing to object to the revised instruction. However, we may review any instruction in the absence of an objection "if the substantial rights of the defendant were affected thereby." (§ 1259.)

this fear during closing argument. Despite no specific allegation in the amended information concerning the threat of retaliation, defendant received adequate notice that the prosecution was relying on the threat of retaliation as one of the grounds for rape as charged in count 4.

**IV**

**Uncharged Acts**

**A. Generally**

Ordinarily, evidence of character generally and past misconduct in particular is not admissible to prove a person's conduct on a particular occasion, though past conduct is admissible to prove a fact, "such as motive, opportunity, intent, preparation, plan knowledge, identity, absence of mistake or accident" or a reasonable good faith belief in consent by a victim in a sex crime. (Evid. Code, § 1101, subd. (b).) However, this restriction on evidence of misconduct does not pertain if the accused is charged with a sexual offense (Evid. Code, § 1108, subd. (b)) in which case evidence of another sexual offense is admissible to prove propensity to commit such an offense, unless rendered inadmissible by Evidence Code section 352. So also, where a defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is admissible under Evidence Code section 1109 to prove propensity to commit such an offense if the evidence is not inadmissible under Evidence Code section 352. In the present case, the prosecution successfully gained admission of past misconduct under all three of the cited statutes.

The prosecution invoked Evidence Code section 1101 to permit evidence of prior uncharged offenses of rape involving Michelle and Leanna to establish defendant's intent to commit all the crimes charged involving the victim, to establish the motive to commit the charged crimes, or that defendant had a plan or scheme to commit the offenses charged.

The prosecution relied on Evidence Code section 1108 to gain admission of evidence of the defendant's commission of other sexual offenses against Michelle, for which he was convicted, and Leanna for which he was charged, though the charges were later dismissed. The parties stipulated that in September 2002 defendant pleaded no contest in a prosecution charging him with two counts of rape of Michelle by force or fear. Sexual misconduct charges pertaining to Leanna in the same case were dismissed as part of the plea bargain. The jury was so informed. The court found the two prior rape convictions involving Michelle and evidence of sexual conduct against Leanna were admissible.

Evidence Code Section 1109 was relied on to permit the prosecution to introduce evidence of domestic violence against Leanna and violence perpetrated on July 26, 2012, against the victim in the present case, prior to the instance of domestic violence charged in the case in chief.

Defendant mounts an expansive challenge to the character evidence the prosecution succeeded in admitting at trial. He insists that none of the evidence offered by the prosecution under Evidence Code section 1101 to prove intent, motive, or common plan or scheme could properly be considered by the jury for any of those purposes—the evidentiary value was too attenuated—and the court's instructions to the contrary violated the Due Process Clause of the Fourteenth Amendment. He argues Evidence Code sections 1108 and 1109 are unconstitutional and cannot therefore serve as a basis for the admission of the evidence of prior sexual misconduct and domestic violence. Even accepting the constitutionality of the statutes, he maintains the testimony of prior sexual misconduct and domestic violence, along with the testimony offered under Evidence Code section 1101 should have been rejected as unduly prejudicial under the balancing scheme of Evidence Code section 352. We consider each challenge in turn.

26

**B. Evidence Code Section 1101**

*Leanna and Michelle*

Referencing acts against Leanna and Michelle the trial court instructed on Evidence Code section 1101, subdivision (b) utilizing CALCRIM No. 375: "The People presented evidence that the defendant committed the offenses of rape by force, fear, or threats as to Leanna in 2001 through 2002 and as to Michelle on May 11, 2002 that were not charged in this case.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may but are not required to consider that evidence for the limited purpose of deciding whether or not: the defendant acted with the intent to commit the prohibited acts of inflicting injury on a fellow parent; and/or rape by force, fear, or threats; and/or to commit attempted sodomy by force, fear, or threats; attempted sexual penetration by force, fear, or threats; sexual penetration by force, fear, or threats; criminal threats; and/or personally using a deadly or dangerous weapon in accordance with the specific intent and/or mental state required as explained in the instruction for that crime in this case; or the defendant had a motive to commit the offenses alleged in this case; or the defendant had a plan or scheme to commit the offenses alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose.

27

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses or that the allegation that defendant personally used a deadly or dangerous weapon has been proved. The People must still prove each charge and allegation beyond a reasonable doubt."

To be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance. The least degree of similarity between the charged and uncharged offenses is required to prove intent, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 (*Ewoldt*).) Defendant challenges the admissibility of the uncharged acts as not relevant to prove intent in counts 2, 3, 4, 7, and 9 involving the victim because the uncharged acts were general intent crimes in contrast to the charged crimes which are specific intent crimes. Defendant offers no authority for the proposition that, to be relevant on the issue of intent under Evidence Code section 1101, subdivision (b), the evidence of the uncharged acts must involve the same mental state as the charged offenses. Neither Evidence Code section 1101, subdivision (b) nor CALCRIM No. 375 express such a requirement. Instead CALCRIM No. 375 instructs the jury it may consider evidence of uncharged acts only to determine whether defendant acted with the intent to commit the charged crimes "in accordance with the specific intent and/or mental state required as explained in the instruction for that crime in this case." Accordingly, the court must determine if the uncharged conduct is sufficiently similar to support the inference that defendant harbored the same intent in the charged counts. (*Ewoldt, supra*, 7 Cal.4th at p. 402.)

Here, defendant's uncharged conduct against Leanna and Michelle bore strong similarities to the counts against the victim. Defendant preceded his sexual assaults against the victim with graphic, specific threats against her and her friends and family.

28

Defendant told Leanna if she talked to anyone about his actions, he would throw her in a ditch where no one would find her. He also told her if he ended up in court, he or someone else would come after her. Defendant told Michelle that he could bury her in the backyard and no one would find her. In addition, defendant said he had gang member friends who would come after her if she did not cooperate.

The sexual assaults against Leanna and Michelle also mirrored defendant's attacks against the victim. Defendant engaged in repeated sexual intercourse with both, and attempted anal penetration. The uncharged acts against Leanna and Michelle bore a sufficient similarity to the charged offenses and the court did not err in instructing pursuant to CALCRIM No. 375.

Uncharged conduct is also admissible under Evidence Code section 1101 to prove a common plan connecting the uncharged acts and the charged acts. Defendant argues no common plan can be inferred from the evidence because the charged offenses center on domestic violence and child custody, the uncharged offenses on sex and rape. Leanna was 14 years old and Michelle was 17 years old at the time of the uncharged offenses, whereas the victim was 27 years old at the time of the charged offenses. The charged and uncharged offenses, ten years apart, can be linked only by propensity.

Defendant ignores that the sexual assault on the victim in August 2012 was not about child custody and that while the offenses were separated in time and the victims were younger at the time than the victim is now, defendant remains about seven years older than Leanna, five years older than Michelle and five years older than the victim. The commonality of the age difference would support a common plan.

### 2012 Assault Against the Victim

The trial court also instructed the jury with CALCRIM No. 375 regarding prior uncharged acts against the victim on July 26, 2012. Defendant contends no logical connection exists between the uncharged conduct and the intent to personally use a deadly weapon in committing the charged offenses.

This version of the instruction specified the prior conduct against the victim: "The People presented evidence of other behavior by the defendant that was not charged in this case: That the defendant held [the victim] on the bed in the bedroom of his mother's home and threatened her with physical injury and/or rape on or about July 26, 2012.

"You may consider this evidence only if the People have proved by a preponderance of evidence that the defendant in fact committed the act. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely." In addition, the court gave the complete instruction as quoted previously.

The victim testified that on July 26, 2012, she and the twins spent the night at defendant's mother's home. Defendant and the victim argued about the children. Defendant threatened to beat her up. He held her on the bed and threatened to have sex with her. Defendant eventually released her and later sent a text message that she interpreted as threatening her or her family.

The uncharged acts against the victim bore a sufficient similarity to the charged offenses to support the inference defendant harbored the same intent in both. In the charged offenses, defendant threatened her and then carried out his threats of sexual assault. He also threatened to harm her or her family. The facts of the uncharged offenses, while not identical and not involving a weapon, bear a sufficient similarity to the charged offenses to support the rational inference that he committed the charged offenses with a similar intent one month later. Defendant also argues the court erred in also instructing pursuant to CALCRIM No. 852 because the instructions taken together

30

allowed the jury to conclude he was guilty of the charged offenses without establishing the specific requirements for each offense.[6]

Both instructions state the evidence of the prior act was insufficient by itself to prove guilt and that the People must prove each element of the alleged offense beyond a reasonable doubt. In addition, the court underscored the burden of proof by instructing that the jury must weigh the evidence in its totality, that the jury must grant defendant the presumption of innocence, and to convict only if the People bore their burden of proving defendant guilty beyond a reasonable doubt. Taken in their entirety, the court's instructions did not lessen the People's burden of proof by instructing pursuant to CALCRIM Nos. 375 and 852.

---

[6] The court instructed with CALCRIM No. 852, in pertinent part: "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically on or about July 26, 2012, defendant held [the victim] on the bed in the bedroom of his mother's home and threatened her with physical injury and rape. [¶] 'Domestic violence' means abuse committed against a person with whom the defendant had a child. [¶] 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and based on that decision, also conclude that the defendant was likely to commit Counts One, Two, Three, Four, Five and Seven as charged here. [¶] If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Counts One, Two, Three, Four, Five and Seven involving domestic violence. The People must still prove each charge and allegation beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose."

31

Underlying defendant's complaints regarding the use of Evidence Code section 1101 as a predicate for testimony concerning defendant's assaults on Leanna, Michelle, and his 2012 assault on the victim is his conviction that the testimony offered to prove the facts permitted by Evidence Code section 1101 was instead treated by the jury as propensity evidence. As we discuss, *infra*, the testimony regarding sexual misconduct and domestic violence was admissible as propensity evidence under Evidence Code sections 1108 and 1109. However, that did not preclude its admissibility under Evidence Code section 1101 so long as the jury is instructed, as it was, to consider the evidence "for the limited purpose of deciding whether or not the defendant acted with the intent to commit the prohibited acts of inflicting injury on a fellow parent; and/or rape by force, fear, or threats; and/or to commit attempted sodomy by force, fear, or threats; attempted sexual penetration by force, fear, or threats; sexual penetration by force, fear, or threats; criminal threats; and/or personally using a deadly or dangerous weapon in accordance with the specific intent and/or mental state required as explained in the instruction for that crime in this case; or the defendant had a motive to commit the offenses alleged in this case; or the defendant had a plan or scheme to commit the offenses alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose."

The cross-admissibility required counsel to remind the jury of the court's limiting instructions but we cannot conclude the instructions were inadequate or that the inferences the prosecution sought to make with respect to intent, motive, plan, or scheme were without an evidentiary basis. We must assume the jury followed the instructions given it.

Finally, whatever the merits of defendant's objections to the grounds asserted by the prosecution for the admissibility of testimony by Michelle, Leanne, and the victim under Evidence Code section 1101, we are also persuaded that any error in the admission

of such testimony on those grounds is harmless; the evidence of defendant's guilt based on properly admitted testimony is overwhelming. Even if the testimony had been excluded under Evidence Code section 1101, much of the testimony was clearly admissible under Evidence Code sections 1108 and 1109 and, together with the direct testimony of witnesses regarding defendant's actions on the occasions in question, rendered the verdict inevitable.

## C. Testimony Admitted Under Evidence Code Sections 1108 and 1109

### *Constitutional Considerations*

In addition to instructing the jury on the admissibility of testimony regarding the defendant's sexual assaults on Leanna and Michelle, and his prior uncharged acts against the victim on July 26, 2012, for the limited purposes set forth in Evidence Code section 1101, the court also admitted the sexual assaults as propensity evidence under Evidence Code section 1108, and the prior assault against the victim as propensity evidence under Evidence Code section 1109.

Defendant challenges the constitutionality of Evidence Code sections 1108 and 1109 but recognizes, as he must, that their constitutionality has been affirmed by prior decisions. We are bound by *People v. Falsetta* (1999) 21 Cal.4th 903, in which the Supreme Court upheld the constitutionality of Evidence Code section 1108, and *People v. Reliford* (2003) 29 Cal.4th 1007, upholding the constitutionality of CALJIC No. 2.50.01, the predecessor to CALCRIM No. 1191, setting forth the controlling principles of Evidence Code section 1108. Defendant challenges Evidence Code section 1109 as violating the Due Process Clause. Again, defendant concedes this court rejected the same argument in *People v. Johnson* (2000) 77 Cal.App.4th 410.

With respect to Evidence Code section 1109, defendant also argues that instructing the jury with CALCRIM No. 852 violated his right to due process. According to defendant, "no evidence supported a rational inference that the July 26, 2012 incident shows appellant's propensity to commit the domestic violence by sex offenses and

33

threats.  Without the supporting rational inference, instructing with CALCRIM 852 under section 1109 violated [defendant's] right to due process."

A permissive inference violates due process if the suggested conclusion cannot be supported by reason and common sense in light of the facts before the court.  (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.)  Defendant claims this is the case here; we disagree.

Similarities abound between defendant's uncharged acts on July 26 and the charged offense on August 26.  In the charged offense, defendant threatened to beat the victim up.  The threat was preceded by a "death note."  Defendant beat, raped, and sodomized her.  He later texted her "I hate what happened.  It was a task recorded and done."  Defendant later texted "green."

Prior to the assault, on July 26 defendant threatened to beat the victim up, got on top of her, pinned her to the bed, and threatened to have sex with her.  She repeatedly begged him to get off of her before he complied.  Defendant got on top of her once again.  Defendant told her he wanted to have sex.  Again, she said, "Get off of me."  Eventually, defendant complied.  The following day, defendant sent her a text about "green light go," which she interpreted as a green light for a gang member to kill either her or someone in her family.

Given the facts before the jury, it would not be beyond reason and common sense for the jury to conclude from the victim's testimony that defendant had a propensity to engage in acts of domestic violence and that his uncharged acts reveal a propensity on defendant's part to commit the charged act.  We find no violation of due process.

## D.  Admissibility Under Evidence Code Section 352

### *Leanna and Michelle*

The prosecution sought to admit Leanna's testimony alleging prior sexual offenses in addition to alleged prior conduct against Michelle and two additional women under Evidence Code sections 1101, 1108, and 1109.  As with his arguments under section

1101, defendant argues the risk of undue prejudice from exposing the jurors to propensity evidence concerning his sexual assaults on Leanna and Michelle, and his earlier physical assault against the victim, far outweighed its minimal probative value.

The parties stipulated that in September 2002, defendant pleaded no contest to counts 1 and 2 in a San Joaquin County case, charging the rape of Michelle by force or fear. In addition, charges pertaining to Leanna in that case had been dismissed as part of the plea bargain. The jury was informed of the dismissal.

After reviewing both case law and the statutes in question, the court stated: "The Court reviewed the following factors as to each alleged prior sex offense: The nature of the offense, relevance, remoteness, the degree of certainty of its commission, and the likelihood of confusing, misleading, or restricting the jurors from their main inquiry, similar to the charged offense, likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the unavailability of less prejudicial alternative to its outright admissions such as admitting some or all of the defendant's sex offenses or excluded details surrounding the offense."

The court found the two prior rape convictions involving Michelle admissible. In addition, the court ruled evidence of sexual conduct against Leanna admissible: "Defendant was charged with three counts of a violation of Penal Code Section 261.5(c), but the charges were dismissed pursuant to defendant's negotiated plea in . . . the same case involving Michelle. The propensity evidence has probative value in the uncharged conduct or behavior, tends to show that the defendant committed the charged offense. The propensity evidence is not stronger or more inflammatory than the charged act. The uncharged conduct is not remote or stale due to defendant's prison status. Propensity is not likely to be confusing, misleading, or distracting for jurors since it is a completely separate incident. And it is unlikely the jury will punish the defendant since he was punished for the conduct occurring at or about the same time as these uncharged acts. Admission of the propensity evidence will not require undue consumption of time since

35

the testimony of the witness as given at the preliminary hearing in 2002 is available to the defendant. The Court has reviewed for the purposes of its ruling the preliminary hearing transcript from June 10, 2002 . . . ."

The court declined to admit the testimony of another woman, based on an undue consumption of time and the risk of jurors punishing defendant for prior conduct since he was not previously charged. Similarly, the court refused to admit the testimony of a second woman concerning an incident on May 11, 2002. The court found the incident was remote and the prosecution failed to show admission in the interest of justice.

We review the trial court's exercise of its discretion under Evidence Code section 352 for an abuse of discretion. The court abuses its discretion when it exercises it in an arbitrary or unreasonable manner. (*People v. Waidla* (2000) 22 Cal.4th 690, 723-724.)

The factors to be considered in the Evidence Code section 352 analysis include: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

The parties differ greatly on the probative value versus potential prejudice of Leanna's testimony. However, after considering the evidence of uncharged crimes against Leanna, we find no abuse of discretion.

The evidence of prior acts by defendant against Leanna was substantially similar to the charged crimes against the victim. In both cases, defendant issued threats in advance. He told Leanna that if she did not obey him, he would kill her, her family, and

36

her friends. Defendant's sexual assaults against Leanna also mirrored his assaults against the victim. Defendant repeatedly had sexual intercourse with Leanna and attempted to anally penetrate her. He also put his fingers in her vagina.

Nor was the evidence concerning the acts against Leanna stronger or more inflammatory than that involving the victim. Although the sexual assaults against Leanna were frequent, they did not involve the beatings with the staple studded belt endured by the victim. Defendant forced her to disrobe and bend over a stool while he beat her until she bled.

The trial court also found the uncharged conduct was neither remote nor stale due to defendant's prison status. The evidence surrounding the offenses against Leanna would not tend to confuse the jury regarding the offenses against the victim. The jury was informed defendant pleaded no contest to two rape counts involving Michelle. Defendant stated he pleaded guilty to the charges so that the counts against Leanna would be dismissed. The jury was aware the counts involving Leanna were dismissed as part of a plea bargain and therefore would not be motivated to punish defendant for the acts. Finally, Leanna's testimony did not take up an undue amount of time and the defendant had access to her preliminary hearing testimony in the prior case.

Despite this, defendant characterizes Leanna's testimony as "extremely weak." After reviewing the prior case in which three counts of unlawful intercourse against Leanna were dismissed, defendant states: "The reasonable inference arises that the People intended no further prosecution on the Leanna charges. This supports the conclusion her claims were dismissed because the case was too weak." Defendant's assertion is purely speculative. Nor is there any authority for the proposition that in order to introduce evidence of prior uncharged acts, the prosecution must be able to prove them beyond a reasonable doubt. There was no error.

### E. Evidence Code Section 1109

Defendant challenges Evidence Code section 1109 as violating the Due Process Clause. Again, defendant concedes we rejected this argument in *People v. Johnson, supra*, 77 Cal.App.4th 410.

In addition, defendant argues instructing the jury with CALCRIM No. 852 violated his right to due process. According to defendant, "[n]o evidence supported a rational inference that the July 26, 2012 incident shows appellant's propensity to commit the domestic violence by sex offenses and threats. Without the supporting rational inference, CALCRIM 852 under section 1109 violated defendant's right to due process."

The trial court instructed the jury with CALCRIM No. 852, quoted previously. However, defendant contends no evidence supported any inference that his July 26, 2012 uncharged behavior had any tendency to show he was predisposed to engage in such conduct. According to defendant, although he threatened to rape and beat the victim he did not do so.

A permissive inference violates due process if the suggested conclusion cannot be supported by reason and common sense in light of the facts before the court. (*People v. Mendoza, supra*, 24 Cal.4th at p. 180.) Defendant claims this is the case here; we disagree.

Similarities abound between defendant's uncharged acts on July 26 and the charged offense on August 26. In the charged offense, defendant threatened to beat the victim up. The threat was preceded by a "death note." Defendant beat, raped, and sodomized her. He later texted her, "I hate what happened. It was a task recorded and done." Defendant later texted "green."

Prior to the assault, on July 26 defendant threatened to beat the victim up, got on top of her, pinned her to the bed, and threatened to have sex with her. She repeatedly begged him to get off of her before he complied. Defendant got on top of her once again. Defendant told her he wanted to have sex. Again, she said, "Get off of me." Eventually,

38

defendant complied. The following day, defendant sent her a text about "green light go," which she interpreted as a green light for a gang member to kill either her or someone in her family.

Given the facts before the jury, it would not be beyond reason and common sense for the jury to conclude from the victim's testimony that defendant had a propensity to engage in acts of domestic violence and that his uncharged acts reveal a propensity on defendant's part to commit the charged act. We find no violation of due process.

## VII

### Cumulative Error

Defendant contends the combined effect of the trial court's errors resulted in prejudicial error denying him a fair trial. According to defendant, the victim's credibility was improperly bolstered by instructional error, reducing the People's burden of proof. Therefore, even if the errors alone would not have caused the jury to convict defendant, combined they had just such an impact. Our review of the record reveals no such cumulative error.

## VIII

### Sentencing Error

**Prior Serious Felony Enhancements**

Defendant argues the court erred by imposing two prior serious felony convictions under section 667, subdivision (a)(1) on counts 1 through 5 and count 7 because the two prior serious felony convictions were not brought and tried separately as required by section 667, subdivision (a)(1). The People concede the error as to counts 1, 3, 5, and 7 and request that we strike one of the five-year enhancements as to only those counts.

Section 667, subdivision (a)(1) provides that "[a]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-

39

year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively."

Section 667.6, subdivision (a) provides: "Any person who is convicted of an offense specified in subdivision (e) and who has been convicted previously of any of those offenses shall receive a five-year enhancement for each of those prior convictions." Subdivision (e) states the section applies to "(1) Rape, in violation of paragraph (2), (3), (6), or (7) of subdivision (a) of Section 261. [¶] . . . [¶] (4) Sodomy in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k) of Section 286. [¶] . . . [¶] (8) Sexual penetration, in violation of subdivision (a) or (g) of Section 298." These offenses do not include attempted sex crimes. (*People v. Le* (1984) 154 Cal.App.3d 1, 10-11.)

As the Court of Appeal noted: "There is little doubt that in enacting section 667.6, the Legislature had a purpose distinct from section 667, former subdivision (a). Clearly, it intended that violent sex offenders, the most incorrigible subset of 'serious' felons, be subject to greater prison terms than mere 'serious' offenders. It accomplished that purpose by omitting from section 667.6 the 'on charges brought and tried separately' restriction included in section 667, former subdivision (a)." (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1275.)

The People concede the two prior serious felony convictions for rape involving Michelle were not brought and tried separately as required by section 667, subdivision (a)(1). Therefore, the court erred in imposing two prior serious felony enhancements as to counts 1, 3, 5, and 7.

However, as to counts 2 and 4, defendant was convicted in count 2 of sexual penetration with a foreign object and in count 4 with forcible rape. Both offenses are specified in subdivision (e) of section 667.6. The two prior serious felony convictions were also for rape and are listed in subdivision (e) of section 667.6. Therefore, the People contend, there was no requirement that the prior convictions have been brought

40

and tried separately as required by section 667, subdivision (a). Defendant agrees "no error appears with respect to imposing both prior serious felony convictions on Counts 2 and 4."

Following the close of briefing the Governor signed Senate Bill 1393, which amended section 667, subdivision (a) and section 1385, subdivision (b) to give the court discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.) Defendant argues, and the People properly concede, that the amendments apply retroactively in this case because defendant's judgment was not final when Senate Bill 1393 went into effect. (See *People v. Jones* (2019) 32 Cal.App.5th 267, 272.) The People assert that we should strike one prior serious felony enhancement for each of counts 1, 3, 5, and 7 and remand the matter to provide the trial court with the opportunity to consider striking the remaining nine prior serious felony enhancements. We agree.

**Sentencing Under One Strike Law and Three Strikes Law on Counts 2 and 4**

Defendant argues the trial court erred by imposing an indeterminate term of 75 years to life on count 2 and an indeterminate term of 75 years to life on count 4. The California Supreme Court in *People v. Acosta* (2002) 29 Cal.4th 105 (*Acosta*) rejected this argument.

Here, the trial court explained its sentencing determination: "As to Counts 2 and 4, the defendant has been convicted of an offense listed in Penal Code Section 667.61(c). It was alleged and proven that the defendant has two prior convictions for an offense listed in Penal Code Section 667.61(c) pursuant to Penal Code Section 667.61(d)(1). [¶] Therefore, pursuant to Penal Code Section 667.61(a) the defendant is sentenced to state prison for a base term of 25 years to life on each count. The 25 years to life term under one strike will be tripled to 75 years to life because of the three strike priors, and, that's pursuant to Penal Code Section 667 (e)(2)(a)(i) and 1170.12(c)(2)(a)(i)."

In *Acosta*, the Supreme Court found a sentencing court may apply both the One Strike law and the Three Strikes law together: "[B]ecause the Three Strikes law and the One Strike law serve separate objectives, ignoring one of these statutes where a defendant meets the criteria of both would defeat one of the Legislature's objectives." (*Acosta, supra*, 29 Cal.4th at p. 127.) The court also summarized the different objectives: "The 'unambiguous purpose' of the Three Strikes law 'is to provide greater punishment for recidivists. [Citation.]' [Citation.] The purpose of the One Strike law is to provide life sentences for aggravated sex offenders, even if they do not have prior convictions." (*Ibid.*) Therefore, the trial court did not err in sentencing defendant under both the Three Strikes law and the One Strike law.

## DISPOSITION

The case is remanded to the trial court with directions to strike one prior serious felony enhancement for each of counts 1, 3, 5, and 7, and to provide the trial court with the opportunity to consider striking the remaining nine prior serious felony enhancements. The trial court shall send to the Department of Corrections a corrected abstract of judgment. In all other respects the judgment is affirmed.


> /s/
> RAYE, P. J.


We concur:


/s/
HULL, J.


/s/
MAURO, J.